IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CONAN DOYLE ESTATE LIMITED,<br><br>      Plaintiff,<br> v.<br><br>THE PARTNERSHIPS and UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE "A",<br><br>      Defendants. | Case No. 22-cv-02887<br><br>**Judge Elaine E. Bucklo**<br><br>**Magistrate Judge Jeffrey Cole** |

## COMPLAINT

Plaintiff Conan Doyle Estate Limited ("Plaintiff") hereby brings the present action against the Partnerships and Unincorporated Associations Identified on Schedule A attached hereto (collectively, "Defendants") and alleges as follows:

### I. JURISDICTION AND VENUE

1. This Court has original subject matter jurisdiction over Plaintiff's claims pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051, *et seq.*, 28 U.S.C. § 1338(a)-(b) and 28 U.S.C. § 1331.

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may properly exercise personal jurisdiction over Defendants because Defendants directly target business activities toward consumers in the United States, including Illinois, through at least the fully interactive e-commerce stores operating under the aliases identified on Schedule A attached hereto (the "Seller Aliases"). Specifically, Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States consumers, offer shipping to

the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, have sold products using infringing and counterfeit versions of Plaintiff's federally registered trademarks (collectively, the "Unauthorized Products") to residents of Illinois. Each of the Defendants is committing tortious acts in Illinois, is engaging in interstate commerce, and has wrongfully caused Plaintiff substantial injury in the state of Illinois.

## II. INTRODUCTION

3. Plaintiff filed this case to prevent e-commerce store operators who trade upon Plaintiff's reputation and goodwill from further selling and/or offering for sale Unauthorized Products. Defendants create e-commerce stores under one or more Seller Aliases and then advertise, offer for sale, and sell Unauthorized Products to unknowing consumers. E-commerce stores operating under the Seller Aliases share unique identifiers, such as design elements and similarities of the Unauthorized Products offered for sale, establishing that a logical relationship exists between them, and that Defendants' counterfeiting operation arises out of the same transaction, occurrence, or series of transactions or occurrences. Defendants attempt to avoid and mitigate liability by operating under one or more Seller Aliases to conceal both their identities and the full scope and interworking of their counterfeiting operation. Plaintiff is forced to file this action to combat Defendants' counterfeiting of its registered trademarks, as well as to protect consumers from purchasing Unauthorized Products over the internet. Plaintiff has been, and continues to be, irreparably damaged through consumer confusion and dilution of its valuable trademarks because of Defendants' actions and therefore seeks injunctive and monetary relief.

### III. THE PARTIES

4. Plaintiff Conan Doyle Estate Limited is a United Kingdom corporation formed by the family of Sir Arthur Conan Doyle. Plaintiff manages the literary, merchandising, and advertising rights in Sir Arthur Doyle's works and all characters, including Sherlock Holmes.

5. Sir Arthur Conan Doyle created Sherlock Holmes in his 1887 novella *A Study in Scarlet*. Sherlock Holmes is one of the most successfully licensed characters who is known and loved all over the world. Widely considered a British cultural icon, Sherlock Holmes is arguably the best-known fictional detective with Guinness World Records listing him as the "most portrayed movie character" in history. Sherlock Holes is known for his proficiency with observation, forensic science, and logical reasoning that borders on the fantastic, which he employs when investigating cases for a wide variety of clients.

6. Plaintiff has authorized major film and television adaptations of Conan Doyle's work and has worked with authors and other creative individuals to release new Sherlock Holmes stories in various media in order to make Conan Doyle's works available to viewers worldwide. To date, Conan Doyle's characters have been translated onto the page, into products, and onto the big screen by Hollywood and beyond. Indeed, numerous movie stars have portrayed Conan Doyle's Sherlock Holmes character, including Jeremy Brett in "The Adventures of Sherlock Holmes", Robert Downy Jr. in "Sherlock Holmes", and Benedict Cumberbatch in the BBC original TV series "Sherlock".

7. Plaintiff and its licensees market and sell a variety of licensed products emanating from the various adaptations of Sherlock Holmes, including clothing and other merchandise bearing the SHERLOCK HOLMES trademarks (collectively, "Plaintiff's Products"). Plaintiff's Products have become enormously popular and even iconic, driven by Plaintiff's quality standards.

Among the purchasing public, Plaintiff's Products are instantly recognizable as such. Plaintiff's Products are distributed and sold to consumers only through authorized licensees, including through websites such as sherlockholmestartan.com and shop.bbc.com/collections/sherlock.

8. Plaintiff and its licensees have used the SHERLOCK HOLMES trademarks and have continuously sold products under Plaintiff's various SHERLOCK HOLMES trademarks (collectively, "Plaintiff's Trademarks"). As a result of this long-standing use, strong common law trademark rights have amassed in Plaintiff's Trademarks. Plaintiff and its licensees' use of the marks has also built substantial goodwill in Plaintiff's Trademarks. Plaintiff's Trademarks are famous marks and valuable assets of Plaintiff. Plaintiff's Products typically include at least one of Plaintiff's Trademarks.

9. Plaintiff's Trademarks are registered with the United States Patent and Trademark Office, a non-exclusive list of which is included below.

| Registration Number | Trademark | Registration Date | Goods and Services |
|---|---|---|---|
| 5,906,240 | SHERLOCK HOLMES | Nov. 12, 2019 | For: Clothing, namely, trousers, coats, vests, neckties, bow ties, capes, suspenders, cummerbunds, hats, skirts, dresses, trews, kilts, scarves, aprons, jackets, pyjamas, bathrobes, knickerbockers, and plus fours; footwear, namely, shoes and slippers; headwear, namely, flat caps, caps, and deerstalker hats in class 025. |

| 4,690,745 | SHERLOCK HOLMES | Feb. 24, 2015 | For: Organisation of exhibitions for cultural, educational, and entertainment purposes in class 041. |
| 5,396,601 | [Sherlock Holmes Conan Doyle Estate Ltd logo] | Feb. 6, 2018 | For: Books and short stories in the field of detective fiction in class 016. |

10. The above U.S. registrations for Plaintiff's Trademarks are valid, subsisting, and in full force and effect. The registrations for Plaintiff's Trademarks constitute *prima facie* evidence of their validity and of Plaintiff's exclusive right to use Plaintiff's Trademarks pursuant to 15 U.S.C. § 1057(b). True and correct copies of the United States Registration Certificates for Plaintiff's Trademarks are attached hereto as **Exhibit 1**.

11. Plaintiff's Trademarks are exclusive to Plaintiff and are displayed extensively on Plaintiff's Products and in marketing and promotional materials. Plaintiff's Trademarks are also distinctive when applied to Plaintiff's Products, signifying to the purchaser that the products come from Plaintiff or its licensees and are manufactured to Plaintiff's quality standards. Whether Plaintiff manufactures the products itself or contracts with others to do so, Plaintiff has ensured that its licensed products bearing Plaintiff's Trademarks are manufactured to the highest quality standards.

12. Plaintiff's Trademarks are famous marks, as that term is used in 15 U.S.C. § 1125(c)(1) and have been continuously used and never abandoned. The success of the Sherlock Holmes line of television shows, movies, and books, in addition to the marketing of Plaintiff's Products, have enabled the Sherlock Holmes brand to achieve widespread recognition and fame

and have made Plaintiff's Trademarks some of the most well-known marks in the entertainment industry. The widespread fame, outstanding reputation, and significant goodwill associated with the Sherlock Holmes brand have made Plaintiff's Trademarks valuable assets of Plaintiff.

13. Products bearing Plaintiff's Trademarks have been the subject of substantial and continuous marketing and promotion. Plaintiff and its licensees have and continue to market and promote Plaintiff's Trademarks in the industry and to consumers through officially licensed websites such as sherlockholmestartan.com and shop.bbc.com/collections/sherlock.

14. Plaintiff has expended substantial time, money, and other resources in advertising and promoting Plaintiff's Trademarks. Plaintiff's Products have also been the subject of extensive unsolicited publicity due to the longstanding success of the Sherlock Holmes brand. As a result, products bearing Plaintiff's Trademarks are widely recognized and exclusively associated by consumers as being high-quality products sourced from Plaintiff or its licensees. Plaintiff's Products have become among the most popular of their kind in the world. Plaintiff's Trademarks have achieved tremendous fame and recognition, adding to the inherent distinctiveness of the marks. As such, the goodwill associated with Plaintiff's Trademarks is of immeasurable value to Plaintiff.

15. Plaintiff's Products are sold only through authorized licensees and are recognized by the public as being exclusively associated with the Sherlock Holmes brand.

16. Defendants are unknown individuals and business entities who own and/or operate one or more of the e-commerce stores under the Seller Aliases identified on Schedule A and/or other seller aliases not yet known to Plaintiff. On information and belief, Defendants reside and/or operate in primarily Asian countries or other foreign jurisdictions and redistribute products from

the same or similar sources in those locations. Defendants have the capacity to be sued pursuant to Federal Rules of Civil Procedure 17(b).

17. On information and belief, Defendants, either individually or jointly, operate one or more e-commerce stores under the Seller Aliases listed in Schedule A attached hereto. Tactics used by Defendants to conceal their identities and the full scope of their operation make it virtually impossible for Plaintiff to learn Defendants' true identities and the exact interworking of their counterfeit network. If Defendants provide additional credible information regarding their identities, Plaintiff will take appropriate steps to amend the Complaint.

## IV. DEFENDANT'S UNLAWFUL CONDUCT

18. The success of the Sherlock Holmes brand has resulted in significant counterfeiting of Plaintiff's Trademarks. Because of this, Plaintiff has implemented an anti-counterfeiting program that involves investigating suspicious websites and online marketplace listings identified in proactive Internet sweeps. Recently, Plaintiff has identified many fully interactive e-commerce stores offering Unauthorized Products on online marketplace platforms such as Amazon, Inc. ("Amazon"), eBay, Inc. ("eBay"), AliExpress, Inc. ("AliExpress"), Alibaba Group Holding Ltd. ("Alibaba"), Fruugo.com ("Fruugo"), DHgate.com ("DHgate"), ecrater.com ("eCRATER"), ContextLogic, Inc. ("Wish"), Joom.com ("Joom"), Onbuy.com ("Onbuy"), Walmart.com ("Walmart"), and Etsy, Inc. ("Etsy"), including the e-commerce stores operating under the Seller Aliases. The Seller Aliases target consumers in this Judicial District and throughout the United States. According to a report prepared for The Buy Safe America Coalition, most counterfeit products now come through international mail and express courier services (as opposed to containers) due to increased sales from offshore online counterfeiters. *The Counterfeit Silk Road:*

*Impact of Counterfeit Consumer Products Smuggled Into the United States*, prepared by John Dunham & Associates (**Exhibit 2**).

19. Because the counterfeit products do not enter normal retail distribution channels, the US economy lost an estimated 300,000 or more full-time jobs in the wholesale and retail sectors alone in 2020. *Id.* When accounting for lost jobs from suppliers that would serve these retail and wholesale establishments, and the lost jobs that would have been induced by employees re-spending their wages in the economy, the total economic impact resulting from the sale of counterfeit products was estimated to cost the United States economy over 650,000 full-time jobs that would have paid over $33.6 billion in wages and benefits. *Id.* Additionally, it is estimated that the importation of counterfeit goods costs the United States government nearly $7.2 billion in personal and business tax revenues in the same period. *Id.*

20. Online marketplace platforms like those used by Defendants do not adequately subject new sellers to verification and confirmation of their identities, allowing counterfeiters to "routinely use false or inaccurate names and addresses when registering with these e-commerce platforms." **Exhibit 3**, Daniel C.K. Chow, *Alibaba, Amazon, and Counterfeiting in the Age of the Internet*, 40 NW. J. INT'L L. & BUS. 157, 186 (2020); *see also* report on "Combating Trafficking in Counterfeit and Pirated Goods" prepared by the U.S. Department of Homeland Security's Office of Strategy, Policy, and Plans (Jan. 24, 2020), attached as **Exhibit 4**, and finding that on "at least some e-commerce platforms, little identifying information is necessary for a counterfeiter to begin selling" and that "[t]he ability to rapidly proliferate third-party online marketplaces greatly complicates enforcement efforts, especially for intellectual property rights holders". Counterfeiters hedge against the risk of being caught and having their websites taken down from an e-commerce platform by establishing multiple virtual storefronts. **Exhibit 4** at p. 22. Since

platforms generally do not require a seller on a third-party marketplace to identify the underlying business entity, counterfeiters can have many different profiles that can appear unrelated even though they are commonly owned and operated. **Exhibit 4** at p. 39. Further, "[e]-commerce platforms create bureaucratic or technical hurdles in helping brand owners to locate or identify sources of counterfeits and counterfeiters." **Exhibit 3** at 186-187. Specifically, brand owners are forced to "suffer through a long and convoluted notice and takedown procedure only [for the counterfeit seller] to reappear under a new false name and address in short order". *Id*. at p. 161.

21. Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States consumers using one or more Seller Aliases, offer shipping to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, have sold and/or offered for sale Unauthorized Products to residents of Illinois.

22. Defendants concurrently employ and benefit from similar advertising and marketing strategies. For example, Defendants facilitate sales by designing the e-commerce stores operating under the Seller Aliases so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers. E-commerce stores operating under the Seller Aliases appear sophisticated and accept payment in U.S. dollars via credit cards, Alipay, Amazon Pay, and/or PayPal. E-commerce stores operating under the Seller Aliases often include content and images that make it very difficult for consumers to distinguish their stores from an authorized retailer. Plaintiff has not licensed or authorized Defendants to use any of Plaintiff's Trademarks, and none of the Defendants are authorized retailers of Plaintiff's Products.

23. Many Defendants also deceive unknowing consumers by using Plaintiff's Trademarks within the content, text, and/or meta tags of their e-commerce stores to attract consumers using search engines to find websites relevant to Plaintiff's Products. Other e-

commerce stores operating under the Seller Aliases omit using Plaintiff's Trademarks in the item title to evade enforcement efforts while using strategic item titles and descriptions that will trigger their listings when consumers are searching for Plaintiff's Products.

24. E-commerce store operators like Defendants commonly engage in fraudulent conduct when registering the Seller Aliases by providing false, misleading and/or incomplete information to e-commerce platforms to prevent discovery of their true identities and the scope of their e-commerce operation.

25. E-commerce store operators like Defendants regularly register or acquire new seller aliases for the purpose of offering for sale and selling Unauthorized Products. Such seller alias registration patterns are one of many common tactics used by e-commerce store operators like Defendants to conceal their identities and the full scope and interworking of their counterfeiting operation, and to avoid being shut down.

26. Even though Defendants operate under multiple fictitious aliases, the e-commerce stores operating under the Seller Aliases often share unique identifiers, such as templates with common design elements that intentionally omit any contact information or other information for identifying Defendants or other Seller Aliases they operate or use. E-commerce stores operating under the Seller Aliases include other common features, such as registration patterns, accepted payment methods, check-out methods, keywords, advertising tactics, similarities in price and quantities, the same incorrect grammar and misspellings, and/or the use of the same text and images. Additionally, Unauthorized Products for sale by the Seller Aliases bear similar irregularities and indicia of being counterfeit to one another, suggesting that the Unauthorized Products were manufactured by and come from a common source and that Defendants are interrelated.

27. E-commerce store operators like Defendants are in constant communication with each other and regularly participate in QQ.com chat rooms and through websites such as sellerdefense.cn, kaidianyo.com, and kuajingvs.com regarding tactics for operating multiple accounts, evading detection, pending litigation, and potential new lawsuits.

28. Counterfeiters such as Defendants typically operate under multiple seller aliases and payment accounts so that they can continue operation despite Plaintiff's enforcement. Ecommerce store operators like Defendants maintain off-shore bank accounts and regularly move funds from their financial accounts to offshore accounts outside the jurisdiction of this Court to avoid payment of any monetary judgment awarded to plaintiffs.

29. Defendants are working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell Unauthorized Products in the same transaction, occurrence, or series of transactions or occurrences. Defendants, without any authorization or license from Plaintiff have, jointly and severally, knowingly and willfully used and continue to use Plaintiff's Trademarks in connection with the advertisement, distribution, offering for sale, and sale of Unauthorized Products into the United States and Illinois over the Internet.

30. Defendants' unauthorized use of Plaintiff's Trademarks in connection with the advertising, distribution, offering for sale, and sale of Unauthorized Products, including the sale of Unauthorized Products into the United States, including Illinois, is likely to cause, and has caused, confusion, mistake, and deception by and among consumers and is irreparably harming Plaintiff.

## COUNT I
## TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)

31. Plaintiff hereby re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

32. This is a trademark infringement action against Defendants based on their unauthorized use in commerce of counterfeit imitations of Plaintiff's Trademarks in connection with the sale, offering for sale, distribution, and/or advertising of infringing goods. Plaintiff's Trademarks are highly distinctive marks. Consumers have come to expect the highest quality from Plaintiff's Products offered, sold, or marketed under Plaintiff's Trademarks.

33. Defendants have sold, offered to sell, marketed, distributed, and advertised, and are still selling, offering to sell, marketing, distributing, and advertising products using counterfeit reproductions of Plaintiff's Trademarks without Plaintiff's permission.

34. Plaintiff's United States registrations for Plaintiff's Trademarks (Exhibit 1) are in full force and effect. Upon information and belief, Defendants have knowledge of Plaintiff's rights in Plaintiff's Trademarks and are willfully infringing and intentionally using infringing and counterfeit versions of Plaintiff's Trademarks. Defendants' willful, intentional, and unauthorized use of Plaintiff's Trademarks is likely to cause, and is causing, confusion, mistake, and deception as to the origin and quality of the Unauthorized Products among the general public.

35. Defendants' activities constitute willful trademark infringement and counterfeiting under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

36. Plaintiff has no adequate remedy at law, and if Defendants' actions are not enjoined, Plaintiff will continue to suffer irreparable harm to its reputation and the goodwill of Plaintiff's Trademarks.

37. The injuries and damages sustained by Plaintiff have been directly and proximately caused by Defendants' wrongful reproduction, use of advertisement, promotion, offering to sell, and/or sale of Unauthorized Products.

## COUNT II
## FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))

38. Plaintiff hereby re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

39. Defendants' promotion, marketing, offering for sale, and sale of Unauthorized Products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or association with Plaintiff or the origin, sponsorship, or approval of Defendants' Unauthorized Products by Plaintiff.

40. By using Plaintiff's Trademarks in connection with the offering for sale and/or sale of Unauthorized Products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the Unauthorized Products.

41. Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the Unauthorized Products to the general public involves the use of counterfeit marks and is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

42. Plaintiff has no remedy at law and will continue to suffer irreparable harm to its reputation and the associated goodwill of the Sherlock Holmes brand if Defendants' actions are not enjoined.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1) That Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under, or in active concert with them be temporarily, preliminarily, and permanently enjoined and restrained from:

   a. using Plaintiff's Trademarks or any reproduction, counterfeit copies or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not one of Plaintiff's Products or is not authorized by Plaintiff to be sold in connection with Plaintiff's Trademarks;

   b. passing off, inducing, or enabling others to sell or pass off any product as one of Plaintiff's Products or any other product produced by Plaintiff, that is not Plaintiff's or not produced under the authorization, control, or supervision of Plaintiff and approved by Plaintiff for sale under Plaintiff's Trademarks;

   c. committing any acts calculated to cause consumers to believe that Defendants' Unauthorized Products are those sold under the authorization, control, or supervision of Plaintiff, or are sponsored by, approved by, or otherwise connected with Plaintiff;

   d. further infringing Plaintiff's Trademarks and damaging Plaintiff's goodwill; and

   e. manufacturing, shipping, delivering, holding for sale, transferring, or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Plaintiff, nor authorized by Plaintiff to be sold or offered for sale, and which bear any of Plaintiff's Trademarks;

2) Entry of an Order that, upon Plaintiff's request, those with notice of the injunction, including without limitation, any websites and/or online marketplace platforms such as

Amazon, eBay, Fruugo, AliExpress, DHgate, eCRATER, Wish, Joom, Onbuy, Walmart, and Etsy (collectively, the "Third Party Providers") shall disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit and infringing goods using Plaintiff's Trademarks;

3) That Defendants account for and pay to Plaintiff all profits realized by Defendants by reason of Defendants' unlawful acts herein alleged, and that the amount of damages for infringement of Plaintiff's Trademarks be increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

4) In the alternative, that Plaintiff be awarded statutory damages for willful trademark counterfeiting pursuant to 15 U.S.C. § 1117(c)(2) of $2,000,000 for each and every use of Plaintiff's Trademarks;

5) Plaintiff is further entitled to recover its attorney's fees and full costs; and

6) Award any and all other relief that this Court deems just and proper.

Dated this 3rd day of June 2022.     Respectfully submitted,

/s/ Martin F. Trainor
Martin F. Trainor
TME Law, P.C.
3339 S. Union Avenue
Chicago, Illinois 60616
708.475.1127
martin@tme-law.com

*Counsel for Plaintiff Conan Doyle Estate Limited*